**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

Bright Lights USA, Inc.,

             Plaintiff,

     v.

Elecsys Incorporated, d/b/a
Delaware Elecsys
Incorporated, Division of
DCX-CHOL Enterprises, Inc.,
a/k/a Elecsys, Division of
DCX-CHOL Enterprises, Inc.

            Defendants.

---

Civ. No. 10-cv-00449(NLH/KMW)

**OPINION**

**APPEARANCES:**

Joshua B. Ladov, Esq.
Ladov Law Firm
1101 Market Street, Suite 2820
Philadelphia, PA 19107

    *Attorney for Plaintiff*

Philip L. Guarino, Esq.
Mavroudis, Rizzo & Guarino
690 Kinderkamack Road
Oradell, New Jersey 07649

    *Attorney for Defendants*

**HILLMAN, District Judge**

    This matter comes before the Court for decision after a
bench trial on the merits.  The parties have submitted proposed
Findings of Fact and Conclusions of Law.  As set forth below,

the Court finds that the parties in this action formed a contract missing an essential term – namely the time for payment.  However, when the time for delivery came both parties acted in a manner inconsistent with a gap-filling measure provided for by New Jersey's version of the Uniform Commercial Code ("UCC") designed to address this very quandary.  The result was either a breach by the plaintiff absolving the defendant of any further performance or a mutual breach of the contract entitling neither side to the benefits that would have flowed from a unilateral breach by the other.

The Court also concludes that Plaintiff's equitable claim is equally defective in that it failed to prove that it acted in detrimental reliance on misrepresentations or conduct of the defendant or is otherwise entitled to equitable relief in light of its own conduct.  Accordingly, the operative complaint in this matter will be dismissed with prejudice.

### I. <u>JURISDICTION</u>

Jurisdiction is founded upon diversity of citizenship pursuant to 28 U.S.C.A. § 1332 (a)(1) in that the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Plaintiff, Bright Lights U.S.A., Inc. ("BL"), is a citizen of the State of New Jersey with a principal place of business at 145 Shreve Avenue, Barrington, NJ 08007.  Defendant is Elecsys,

2

Division of DCX-CHOL Enterprises, Inc. ("Elecsys"), a Colorado
corporation with its principal place of business in that state.

## II. <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u> [1]

The Court makes the following Findings of Fact and
Conclusions of Law.

### A. <u>Findings of Fact</u>

1.  BL is a manufacturer and distributor of defense spare
parts. Trial Tr. 34.[2]

2.  On July 9, 2007, BL submitted a quotation (Pl. Exh. 1)
for a hose assembly in response to a request from Shauna Shay
("Shay") of Elecsys.  Trial Tr. 36.  The quotation provided her
with a price on certain made-to-order components for an M-88
light armored recovery vehicle used by the U.S. Army.  Trial Tr.
37.  The quotation provided for payment on Cash On Delivery
("COD") terms.  Id.

3.  A second quotation dated July 17, 2007 was provided (Pl.
Exh. 2) for a hose assembly, again with COD terms.  Trial Tr. 38-
39.

4.  A third quotation (Pl. Exh. 3) was provided for
additional hose assemblies dated July 27, 2007, again with COD
terms.  Trial Tr. 40.

---

[1]    To the extent any Findings of Fact are more appropriately
categorized as Conclusions of Law, and vice versa, they are
adopted as such.
[2]    "Trial Tr." refers to Trial Transcript.

5.  Elecsys submitted a July 13, 2007 purchase order (Pl. Exh. 4) for the goods that had been quoted as of that date. Trial Tr. 41.  The terms section was left blank, and the purchase order referenced the July 9, 2007 BL quotation.  Trial Tr. 41. Shay referenced the quotation so that someone reading the purchase order would know where the price and delivery terms came from.  Trial Tr. 170-71.  The amount of the order was $38,340. Trial Tr. 42.

6.  The purchase order was then modified two times, as the items ordered were components of another assembly.  Trial Tr. 42-43.  The second version of the purchase order (Pl. Exh. 5) was for two hose assemblies, and it was to supplant and take the place of the first version.  Trial Tr. 43.  Lines 1, 2, and 3 on the first purchase order became line item 5 on the second purchase order.  Trial Tr. 43.  The second purchase order, like the first, contained nothing in the payment terms section and expressly referenced the BL quotation.  The amount of the order was $64,260.  Trial Tr. 44.

7.  In an e-mail dated July 19, 2007 (Pl. Exh. 6), Shay attached a copy of her company's corporate information and requested terms[3] rather than COD.  Trial Tr. 45.  Because Shay

---

[3]     Customarily, and as used by Shay, the phrase "terms" meant a short term extension of credit by the seller in which the buyer would pay for the goods in full within a short period of time after delivery – typically 30 days.

4

was requesting terms, she provided Dan Farber ("Farber"), the president of BL (Trial Tr. 35), financial information about Elecsys.  Farber replied that generally BL does not consider terms until the company procures $100,000 in product a year, but that he was sending the information to the BL accounting department for evaluation and that he would let Shay know as soon as possible.  Trial Tr. 45.

8.  In his response to Shay (Pl. Exh. 6) on July 19, 2007, Farber also told Shay that BL already had started work on the two items of the purchase order (Pl. Exh. 5).

9.  On July 27, 2007, Shay sent an e-mail to Farber (Pl. Exh. 6) asking him whether he had any response to her question about the terms of payment.  Trial Tr. 45-46.  That day or at the beginning of the following week Farber testified that he orally told Shay that the terms were as quoted, i.e., COD.  Trial Tr. 46.

10.  On July 30, 2007, Shay sent an e-mail (Pl. Exh. 7) with a revised and final version of the full purchase order to Farber. Trial Tr. 46.  Once again, Shay asked "Please … advise on terms." Id.  Upon receiving the e-mail and revised purchase order, Farber wrote to tell Shay that BL would need a wire transfer prior to dispatch.  Trial Tr. 46-47.  Whatever the discussions had been previously about either a short extension of credit or COD, from

5

the perspective of BL the terms were now CIA or "cash in
advance."  Trial Tr. 47.  According to Farber, had BL shipped the
goods COD the freight company would have charged Elecsys six
percent of the value of the goods.  Trial Tr. 47.  Farber
testified that BL wanted cash in advance because it was trying to
"offer excellent customer service to our clients."  Trial Tr. 48.
Whatever Farber's motives may have been, Shay never agreed to CIA
terms.

    11.  As noted, the third, revised purchase order (Pl. Exh.
8) sent with Shay's July 30, 2007 e-mail was the final version.
Trial Tr. 48.  It was for three different hose assemblies.  Trial
Tr. 49.  As with the first two versions, the terms section was
left blank and the original quotation which included COD terms
was referenced.  Trial Tr.49.  The only difference between the
second version of the purchase order (Pl. Exh. 5) and the final
version (Pl. Exh. 8) was the addition of line item 6 and the
referencing of a different quotation made by a different BL
individual.  Trial Tr. 49.

    12.  The final purchase order stated that Elecsys would
accept delivery any time after November 1, 2007.  Trial Tr. 49.
There was a column at the right of the purchase order labeled
"REQ. date." with different dates for the three items, the
earliest being December 12. 2007 and the latest being December

28, 2007. Trial Tr. 50.  According to Farber, and it seems a reasonable interpretation, this meant that Elecsys wanted the goods in its possession by these dates.  Trial Tr. 50.

13.  The third purchase order dated July 30, 2007, as did the first two versions, contained language that stated: "This PO is governed by the terms and conditions found at HTTP [website][]", a reference to Elecsys's website which contained a set of standard or boilerplate purchase terms for transactions with vendors ("Terms and Conditions").  Trial Tr. 50.  Farber admitted that he had gone to the Elecsys website to read the Terms and Conditions.  Trial Tr. 51.  Farber also acknowledged under cross-examination that is was important for him to have done so because in general the Terms and Conditions were incorporated into the purchase order.  Trial Tr. 93-95.

14.  When BL acknowledged the July 30, 2007 purchase order (Pl. Exh. 9), a BL employee hand-wrote "COD" in the terms section.  Trial Tr. 52.  As detailed below, this directly contradicted the Terms and Conditions on the Elecsys website. Trial Tr. 121.  Farber does not recall Shay ever agreeing to COD terms.  Trial Tr. l03-04.  Shay never agreed to COD terms (Trial Tr. 160, 164, 168) nor did anyone else at Elecsys.  Nobody contacted Shay prior to writing COD on the purchase order.  Trial Tr. 164.  By the time BL confirmed the purchase order on July

7

30th, BL had already begun work on the purchase order items beginning no later than July 19th.  Trial Tr. 51.

15.  The Terms and Conditions (Def. Exh. 15) provided at Section 2 that, unless otherwise stipulated in the body of the purchase order, invoices would be paid within 30 days of receipt of the goods or the invoices, whichever was later.  Trial Tr. 95. Farber recalled having read Section 2 at the time.  Trial Tr. 95. However, he did not recall speaking to Shay about it.  Trial Tr. 97-98.  Although he spoke to Shay about COD terms, Farber concedes that Shay never agreed to pay COD.  Trial Tr. 98, 117. According to Farber, she did later agreed to pay CIA (Trial Tr. 98, 117), a claim she denied.  Trial Tr. 163.

16.  Section 6 of the Terms and Conditions expressly precludes COD payments without the consent of Elecsys.  Trial Tr. 208.  Farber acknowledged that at the time BL accepted the job it knew that there was nothing on the purchase order that expressly provided for COD terms, and that the website Terms and Conditions called for payment in 30 days.  Trial Tr. 105.

18.  Farber also acknowledged that Section 5 the Terms and Conditions contained a cancellation provision.  Trial Tr. 100. Under Section 5, the order could be cancelled at any time, even if the goods had already been manufactured.  Trial Tr. 100, 205. Cancellation could be for cause (Section 5(a)), or for

convenience (Section 5(b)).  Trial Tr. 205.  The Terms and
Conditions provided an exclusive remedy in the event of a
cancellation: either Elecsys could take delivery of the goods and
pay for them or, if it did not so elect, it could pay BL the
difference between the order price and any decrease in the market
value of the goods at the time of cancellation.  Trial Tr. 100.

19.  If applicable, the Terms and Conditions expressly
superseded any prior acknowledgements or proposals that might
have been made.  Trial Tr. 101.  Moreover, the Terms and
Conditions provided that no modification or release of the terms
could occur absent a writing specifically identified as a
modification or revision.  Trial Tr.102, 204.  Farber concedes
that he knew that the Terms and Conditions could not be modified
without a written agreement signed by Elecsys.  Trial Tr. 102.
Shay never expressly modified the Terms and Conditions.  Trial
Tr. 164, 168.

20.  Farber concedes that nowhere in writing did Elecsys
ever agree to COD terms.  Trial Tr. 102.  He further concedes
that Shay never agreed to COD terms.  Trial Tr. 107.  Shay, for
her part, testified that she told Farber that Elecsys would not
agree to COD terms.  Trial Tr. 186.

21.  On September 20, 2007, Shay sent an e-mail to Farber
(Pl. Exh. 10), in which she stated that, in accordance with a

9

telephone conversation earlier that week with Farber, she had requested that a pro forma invoice be sent to her and that shipments not be made until all items were completed.  Trial Tr. 52-53.  In this same e-mail, she stated:  "Due to the large amount we had talked about doing a cash in advance which would mean you would receive payment before shipment."  Trial Tr. 53; Pl. Exh. 10.  She further stated: "Please advise if I had misunderstood our conversation.  Let me know of any questions there may be."  Trial Tr. 53; Pl. Exh. 10.

22.  Although Farber contends that Shay agreed to pay CIA in the conversation that occurred before the September 20, 2007 e-mail (Trial Tr. 107), he concedes that there is nothing in writing, including the September 20, 2007 email, in which Elecsys expressly agreed to pay CIA.  Trial Tr. 109.  Nowhere in this e-mail, however, does Shay expressly agree to pay CIA and the Court credits her testimony that she did not agree to those terms then or at any time before.  Trial Tr. 165, 168.  Nor did Michael Jamison, Elecsys' vice-president.  Trial Tr. 167.

23.  By no later than September 21, 2007, the day after Shay's e-mail concerning CIA payment, the goods had already been fabricated.  Trial Tr. 108.

24.  In an e-mail sent by Shay (Pl. Exh. 10) the day after her September 20, 2007 e-mail, Shay stated that Elecsys did not

10

want shipment until after the first of October.  Trial Tr. 55;
Pl. Exh. 10.  Farber wanted to ship the goods in September but no
one at Elecsys had agreed to this.  Trial Tr.123, 166.  Elecsys
planned the delivery based on when it would be receiving goods
from other suppliers, so that the goods could be received and
assembled at the same time and then sent to its customer.  Trial
Tr. 166, 180, 203.

25.  The pro forma invoices requested by Shay on September
20, 2007 were sent to her on September 26, 2007 by e-mail (Pl.
Exh.12).  Shay was told that the order was ready to be shipped.
Trial Tr. 59.  In response, Shay wrote the next day that she had
not received any invoices for line items 4 or 6 and she requested
the invoices so that she could forward all invoices at the same
time. Trial Tr. 60.  The remaining invoices were provided on
September 27, 2007.  Trial Tr. 61.

26.  Ultimately, three invoices were provided.  Trial Tr.
61.  They were generated by BL. Trial Tr. 118.  BL ordinarily
invoices goods as they are completed.

27.  The first invoice (Pl. Exh. 13) is dated September 21,
2007.  Trial Tr. 61.  The invoice amount was $28,800.  Trial Tr.
62.  Under the terms section it provides "COD" in type and then
in handwriting "/CIA." Trial Tr. 62.  The handwritten term "/CIA"
was added by Farber's secretary, Carol Haggerty, presumably at

11

Farber's direction.  Trial Tr. 62-63.  The second invoice (Pl. Exh. 14) was for $28,800, and it also provided "COD" in type and then in handwriting "/CIA", again added by Haggerty after she first prepared the invoices by computer specifying COD terms. Trial Tr. 63.  The third and final invoice (Exh. 15) was for $35,460, and the terms section simply stated "COD."  Trial Tr. 64.  There is no reference to CIA which Farber characterized as an "omission" by Haggerty.  Id.

28.  Farber testified that it would have taken no more than five days for the truck to reach Elecsys.  Trial Tr. 113-14.

29.  As prepared, the invoices were not consistent with either COD or CIA payment.  According to the first invoice (Pl. Exh. 13), the shipping date was September 21, 2007 and the arrival date at Elecsys was presumably no later than September 26, 2007.  Trial Tr. 114.  The invoice, however, did not call for payment until October 1, 2007.  Id.  Accordingly, the delivery and payments dates on the invoice are inconsistent with COD payment.  Id.

30.  According to the second invoice (Exh. 14), the shipping date was September 25, 2007 and the truck therefore should have reached Elecsys by September 30, 2007.  Trial Tr. 115.  According to the invoice, however, payment was not due until October 5, 2007.  Id.  According to Farber, it called for COD payment

12

because the check would not have reached BL until October 5,
2007.  Trial Tr. 116.  The Court does not credit this testimony
as it is inconsistent with the plain and ordinary meaning of COD.
Indeed, Farber admitted that COD means payment on the date the
check is issued, and that the check is issued on the date that
the truck arrives.  Trial Tr. 116.

31.  According to the third invoice (Pl. Exh. 15), the
shipping date is September 26, 2007 and the truck therefore would
have arrived at Elecsys no later than October 1, 2007.  Trial Tr.
117.  According to the invoice, however, payment was not due
until October 6, 2007.  In sum, none of the three invoices were
issued in a manner consistent with COD delivery much less CIA
delivery, a fact Farber acknowledged in his testimony.  Trial Tr.
118.

32.  Phyllis Reilly of the BL accounting department candidly
testified that if the terms had been CIA the invoice payment date
would have been the shipment date.  Trial Tr. 152, 154.  And if
the terms had been COD, the check would have been written when
the merchandise was received.  Trial Tr. 154.

33.  Elecsys standard policy to seek 30 days for payment was
based on a desire to inspect goods for defects or non-conformity
prior to payment.  Trial Tr. 222-23.  The company assumes some
risk when it pays COD and even more risk when it pays CIA.  Trial

13

Tr. 119.

34.  Farber refused to ship the goods to Elecsys unless it

paid CIA.  Trial Tr. 63-66.  Over the next several weeks in

October BL sought payment prior to shipment.  Its requests were

largely ignored.  Trial Tr. 63-65.

35.  Somewhere around the 29th of October or perhaps the

26th, Farber received a telephone call from an officer of Elecsys,

who told him that if Elecsys was not given terms it would cancel

the order. Trial Tr. 65-66.  Farber responded that Shay had

agreed to CIA payment terms.  Trial Tr. 66.  On October 30, 2007,

Shay sent an e-mail to Farber (Pl. Exh. 17) cancelling the order.

Shay cancelled the Order at the direction of Michael Jamison, her

general manager.  Trial Tr. 197.  Jamison cancelled the order

because BL had refused to give Elecsys terms.  Trial Tr. 205.

36.  Under the Terms and Conditions (Def. Exh. 15), Elecsys

could cancel the order for convenience.  Under the Terms and

Conditions, if Elecsys legitimately cancelled for convenience it

obligated itself to pay the vendor the difference, if any,

between the order price and the market value of the goods at the

time of cancellation.  Trial Tr. 124, 207. If the Terms and

Conditions apply, this is the vendor's sole remedy.  Trial Tr.

140, 207.

37.  As set forth above, Shay canceled the order because she

was told to by Jamison.  Jamison never told Shay the reason why
he was canceling the order, nor did she ask him why the order was
being canceled.  Trial Tr. 192-193.  Jamison never told Farber
why Elecsys canceled (Trial Tr. 67, 221), and never told anyone
at Bright Lights that Elecsys had terminated for "convenience."

38.  The U.S. Government, the customer for whom Elecsys
issued its Purchase Order in the first place, never canceled its
order with Elecsys, and Elecsys ultimately found another vendor
for the items that were originally requested in the Purchase
Order.  Trial Tr. 226.

39.  Prior to the October 30, 2007 cancellation, Farber had
a telephone conversation with Neal Castleman, President of
Elecsys, in which Castleman demanded payment terms.  Farber
advised him that Shay had agreed to pay cash in advance, that the
Goods had been made, were being held for shipment, and that the
invoices had been presented to Shay for payment.  Castleman
stated that if Elecsys did not get terms, the order would be
canceled.  Farber stated that was not the arrangement he had with
Shay, and Castleman hung up the phone.  Trial Tr. at 65-66.

40.  Prior to Shay's cancellation e-mail, neither Shay nor
anyone else at Elecsys ever communicated an intent to cancel the
order to anyone up BL, and Elecsys had never used the terms
"cancellation for convenience" or other basis for cancellation.

Trial Tr. 66-67, 134-135, 193-194.

41.   Assuming without finding that the website terms became part of the contract, BL never received directions with the termination to take any action with respect to the goods contrary to the requirements of Section 5 of the website Terms and Conditions.   Trial Tr. 134-135.   Similarly, Elecsys never sent any such instructions to Bright Lights pertaining to either Sections 5 or 3 of the same Terms and Conditions.   Trial Tr. 196.

B. ANALYSIS AND CONCLUSIONS OF LAW[4]

It is clear that the parties to this matter entered into a valid contract in July 2007.   A contract for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."   N.J. Stat. Ann. § 12A:2-204(1).   That the precise date or act consummating the agreement is difficult to pinpoint does not cloud or diminish the fact that Elecsys, after receiving several quotes from BL, issued a series of purchase orders culminating in the final July 27, 2007 purchase order for the items BL eventually built.   By that point in time, the parties had identified the goods with precision, had negotiated a

---

[4]   The parties have stipulated to the application of New Jersey law which presumably includes a stipulation to New Jersey choice of law rules.   The parties have not argued, and the Court has not independently determined, that New Jersey law compels the application of any law other than its own substantive law to the facts of this case.

16

price, had set both an initial and outside delivery date, and the buyer had extended an offer to buy which the seller accepted both in word and in deed by beginning production -  a fact known to the buyer.  A contract "may be found even though the moment of its making is undetermined." N.J. Stat. Ann. § 12A:2-204(2). Indeed, neither party strenuously argues that no contract existed and both appear to agree that one was reached.

Where they differ, and substantially so, is whether the parties agreed to what is ordinarily understood to be an essential component of any sales contract, the mode and timing of payment.  What was clearly missing from the discussion leading to and surrounding the formation of the contract was any clarity or precision or, more importantly, any agreement, as to payment terms.  Although both sides argue with equal force that the terms of payment terms are clear, the Court finds, for the reasons that follow, neither argument convincing.

Plaintiff presented testimony and offered argument that the initial payment terms were COD and that the COD terms were later modified by agreement to CIA.  Although there is more evidence to support the first argument, neither has much factual support. Farber testified that Shay orally agreed to COD terms.  There is, however, little or no objective evidence to support this contention and it is contrary to the paperwork that exchanged

17

hands and inconsistent with the conduct of the parties during the course of the performance of the contract.  One would expect that if that agreement was reached it would be reflected in both the paperwork and the conduct of the parties.

As for the paperwork, while it is true that the purchase orders made specific reference to the quotations which clearly spelled out COD terms, the purchase orders themselves were curiously silent on the topic.  Moreover, in their documented communications Shay repeatedly requested and sought acquiescence for a sale based on terms, i.e., a short extension of credit.  It begs the question that if Shay had agreed to COD terms upon the issuance of the first purchase order or shortly thereafter why Farber would continue to consider it and why Shay would continue to seek an answer on the question as late as July 30th.

The contention that Shay agreed to CIA terms is equally unpersuasive.  The first time the issue appears to arise is on July 30th when in apparent response to her continuing request for payment terms Farber asks, or seemingly demands, payment in advance.  Farber explains this demand as an effort at "customer service" to lower costs and contends the offer was accepted but again there is no evidence to support it.  Again, one would expect there to be written confirmation of such an important change and there is none.  Although offered as such, the

18

September 20, 2007 email falls short of proving an agreement on
CIA terms.  What it does prove is that throughout the ordering
and manufacturing process the parties continued to discuss, and
indeed negotiate, the terms of payment.  What the email confirms
is that Farber offered to accept CIA payment, that he tried to
convince Shay that it would be beneficial to Elecsys to pay that
way to lower shipping costs, that Shay was considering it, and
nothing more.

Finally, Farber's unequivocal claim that Elecsys agreed
first to COD terms and then to CIA terms is belied by his
company's internal paperwork.  At a time he claims he had
negotiated CIA terms, his office unilaterally handwrote "COD" on
the purchase order confirmation and when invoices were issued and
again unilaterally modified by his staff to include CIA terms,
the actual delivery and payment dates were inconsistent with both
COD and CIA terms.

However, these blaring inconsistencies and shifting and
ongoing discussions as to the financial terms are equally fatal
to Elecsys's sterile contention that this is all explained by its
website.  It is, of course, commonplace for commercial parties to
exchange battling forms and here that obviously occurred.   BL's
quotation, incorporated by reference in the purchase order,
plainly spelled out COD terms.  The Purchase Order, however, left

the terms section blank, a seeming rejection of the COD terms,
and incorporated by express reference the website terms which
plainly and unequivocally set forth terms of 30 days.  If that
were all to the case, the Court would apply the UCC and resolve
the battling forms by reference to the Code.

However, to do that there here would ignore the plain fact
that the parties were engaged in an ongoing human negotiation of
the same payment terms.  This is not to say that the buyer cannot
offer and the seller cannot accept by the exchange of written
forms (as described on the website) a contract provision that
requires all modifications to be written or to counteroffer
essential terms such as payment.  These situation are commonplace
and as noted anticipated by the UCC.  What it does say is that
despite the website content and the conflicting forms, the actual
conduct of the parties shows that no agreement was ever reached
over payment terms.  An exchange of forms should not be able
trump the actual intent of the parties which is the essence of
contract.  In the view of this Court, the UCC does not elevate
forms, if you will, over the content of the parties very real
discussions.

This interpretation of events is the only one that explains
and gives the meaning the parties intended at the time to Shay's
conduct and discussions with Farber.  If she (and as its agent,

20

Elecsys) had offered and BL had accepted the terms of the website
(COD) then why would Shay have continued to press for acceptance
of the very terms Elecsys now says occurred as a matter of law
month before?  Would she have not simply said: "Did you not read
the purchase order and see the reference to our website?"[5]  No
such discussion occurred.  The simple answer is that the exchange
of forms was not intended by the parties to be the platform or
mechanism to negotiate payment terms.  Nor is it an answer to
simply contend, as both Shay and her superior testified, that
Shay lacked the authority to negotiate payment terms.  As the
primary purchasing agent on this contract, her authority was both
real and apparent.

     So if the parties never reached agreement on the terms of
payment what does the law require?  First, as the parties
recognize this lack of an essential term does not doom the
contract.  Corestar Int'l Pte. Ltd. v. LPB Commc'n, Inc., 513 F.
Supp. 2d 107, 116-17 (D.N.J. 2007) (where parties agree to
essential elements of contract, court applies N.J. Stat. Ann. §
12A:2-207 to determine terms to which parties have not agreed);
Richardson v. Union Carbide Indus. Gases, Inc., 347 N.J. Super.
524, 532, 534, 790 A.2d 962 (N.J. Super. App. Div. 2002) (when

---

[5]     Nor did Elecsys's president explain it that way in his last
exchange with Farber.  He did not say: "You already agreed to
this." He said: "If you don't agree to give us terms [now], we
will cancel."

there are conflicting terms in contracts, conflicting terms fall

out and, if necessary, are replaced by suitable U.C.C. gap-filler

provisions).

The drafters of the UCC anticipated this scenario as well

and set forth a gap filling provision that balances the interests

of a seller to prompt payment with the interests of a buyer in

having a reasonable opportunity to reject obviously defective or

non-conforming goods.  According to N.J. Stat. Ann. § 12A:2-

310(a), unless otherwise agreed upon by the parties to the

contract, "payment is due at the time and place at which the

buyer is to receive the goods[.]"  Under Section 2-310(b),

however, if as here the seller ships the goods "the buyer may

inspect the goods after their arrival before payment is due . . .

[.]"  N.J. Stat. Ann. § 12A:2-310(b).[6]

Since the parties failed to agree on payment terms, these

provisions became part of the agreement and bound the parties as

a matter of the law.  The next question is then whether either

side acted in conformity with these provisions.  This Court

concludes that both parties acted in a way inconsistent with this

---

[6]     Section 3-210(b) of the New Jersey U.C.C. expressly
references Section 2-513, dealing with the buyer's right to
inspect goods.  Section 2-513 provides that, unless otherwise
agreed, "the buyer has a right before payment or acceptance to
inspect [the goods] at any reasonable place and time and in any
reasonable manner" and "the inspection may be after their
arrival."  N.J. Stat. Ann. § 12A:2-513(1).

provision by insisting on – indeed demanding - compliance with contract terms that were neither bargained for nor agreed to and were also, under the circumstances, commercially unreasonable. Stated differently both parties breached the contract.

Before addressing that conclusion from the perspective of BL, we first address Elecsys's contention that it was not in breach because it terminated the contract "for convenience", in part to reject the defense as inconsistent with the facts and in part to show how Elecsys was itself in breach of the agreement. It is true that Elecsys's website incorporated into the final purchase order terms that allowed the Defendant to terminate the agreement for convenience in exchange for the sole remedy of paying the difference between the order price and the market value of the goods at the time of cancellation.  Such terms are commonplace in contracting situations like this one and in some sense merely codify or memorialize the common law notion – designed to promote economic efficiency – that commercial actors should be free to terminate contracts in favor of alternative transactions so long as they are willing to pay reasonable damages.  Assuming for present purposes that those terms became part of the agreement, Elecsys would have had to have acted in a way consistent with those terms.  However at no point did it do so.

First, its employees did not act in a way consistent with the proffered reason.  Shay never told Farber that was the reason and that was not stated reason internally.  Moreover, neither Shay nor anyone else discussed with BL the second part of the termination provision, namely BL's entitlement to the price differential, or provided directions regarding the goods as set forth in the Terms and Conditions.  More importantly, however, the clear and indeed admitted facts are the Elecsys cancelled the contract not because it had problems with the general contract with the government, not because it found a better product, not because it found a better price, and not for any other reason that could fairly characterized as "convenience."

Rather, it cancelled the contract solely and expressly because BL refused to ship the goods on at least 30 day terms. Yet, it had no reason to insist on those terms.  They had not been agreed to.  Its employee, Shay, had clearly discussed the possibility of other payment arrangements, and Elecsys knew that BL had manufactured the goods and was holding them for delivery. In the absence of an agreement on terms, Elecsys could have and should have offered to accept the goods and pay consistent with the gap-filling provisions of the UCC.  Instead it insisted on a new and unacceptable term at the eleventh hour.  As succinctly stated by counsel for Bright Lights, "[t]he cancellation for

24

'convenience' … was a fiction fabricated after the cancellation
for the purposes of litigation to disguise a breach of contract
as an otherwise ostensibly valid cancellation term designed to
fit within the Website Terms and Conditions cancellation
provisions."

Moreover, as a matter of law a "termination for convenience"
clause should not act to cloak a buyer with immunity to breach an
otherwise valid contract by insisting on terms neither bargained
for nor provided by law.  To hold otherwise would allow any
commercial buyer to breach a contract for any reason, limit its
damages to the price differential, and effectively nullify any
cause of action by an aggrieved seller for lost profits, specific
performance and other common contract remedies.

If this were all the facts this case revealed BL would have
been entitled to judgment on its contract claims and the full
panoply of contracts remedies.  Here, however, BL was also in
breach of the agreement as determined by the gap-filling
provisions of the UCC and, crucially, was so at a much earlier
date.  As set forth above, beginning no later than July 30, 2007,
Farber began to insist on cash in advance and never really
abandoned that position all the way through Shay's cancellation
email.  Although Farber testified that Shay agreed to those
terms, as set forth above there is scant evidence to support that

25

contention and all the other evidence in the case is to the contrary.

Farber's true intentions regarding this supposed agreement is revealed by his own testimony in reference to Carol Haggerty's invoice: "Due to the value of the goods going out, it would not be appropriate to ship them COD. It's best to ship CIA, avoiding the 6 percent, at least, charge by the shipping company."  In short, Farber sought to substitute his own business judgment for that of the less aggressive and experienced Shay.  There are of course any number of reason why Elecsys would be willing to pay six (6) percent or more to inspect the goods before payment, even more so in the case of specially manufactured goods.  It was simply not Farber's place to make that judgment for Elecsys. More importantly, since a right of inspection is provided for by UCC, Farber's unilateral insistence on CIA terms breached the contract.

In sum, both parties acted in a way inconsistent with the terms of the contract as determined by law and in each in a commercially unreasonable way.  Elecsys knew that the goods were ready to be delivered and could have simply asked for the right of inspection provided for by the UCC.  By insisting on terms of 30 days, after its agent had left open the possibility of different terms and allowed the manufacturing and delivery

process to proceed, Elecsys breached the contract.

Similarly, by insisting on CIA a terms that had never been accepted and not offering a right of inspection, BL was also in breach. What is critical in this case is that BL could be said to have breached first. As such, Elecsys is excused from performance and no claim for breach of contract exists. "It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance." Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 285, 723 A.2d 976 (N.J. Super. App. Div. 1998); Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341, 173 A.2d 258 (N.J. 1961) ("If the breach is material, i.e., goes to the essence of the contract, the non-breaching party may treat the contract as terminated and refuse to render continued performance.") (citing 6 Corbin, Contracts, § 1253 (1951)).

Even if the Court assumes the breach was, as the Court called it during trial, a "mutual" breach, Plaintiff could still not recover. Where both parties breach, they are left in their original places each absorbing their respective losses and compensating the other only if some benefit was conferred. Here, both parties agree that no benefit was conferred on either side. See Magnet Res., Inc., 318 N.J. Super. at 285 (noting that

27

restitution may be recoverable even by breaching party)(citing Restatement (Second) of Contracts § 374).  Accordingly, the Court will dismiss BL's contract based claims.

The absence of a contract remedy does not end the matter because BL has also asserted a claim for equitable estoppel.  The elements of a claim for promissory estoppel are (1) a clear and definite promise, (2) made with the expectation that the promisee will rely on it, (3) reasonable reliance, and (4) definite and substantial detriment.  Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cnty. of Burlington, 194 N.J. 223, 253, 944 A.2d 1 (2008) (citing Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499, 815 A.2d 1013 (N.J. Super. App. Div.), certif. denied, 177 N.J. 224, 827 A.2d 291 (2003)).

The Court recognizes that this claim has some superficial appeal and some factual support in the record.  The final purchase order may be fairly characterized as a promise to purchase from BL the specified goods in the quantities and for the prices set forth in that document.  Moreover, as set forth above Elecsys knew that BL was filling the order, and waited until after the specially manufactured goods were completed, invoiced, and ready for shipment, to cancel the order when the negotiations over payment terms finally collapsed into mutual breach.  And BL has surely suffered some detriment in that it is

28

apparently to this day, as Plaintiff describes it, "stuck" with goods it cannot sell with the all attendant costs and lost profits.

However, what the Court cannot conclude is that BL reasonably relied on some misrepresentation by Elecsys or that Elecsys failed to disclose some material fact which if known to BL would have allowed it to change its position or mitigate its damages.  First, BL acted to accept the contract and began the manufacturing process before the parties concluded the negotiations on payment terms.  It cannot be said that it relied on any promise to pay on CIA or COD[7] terms since no express or implicit promise was made or agreement reached on those terms.  At best, BL hoped to finalize payment along those lines but had no reason to believe that would be the case especially in light of Shay's continued and repeated request for terms.

Equitable estoppel requires that the plaintiff prove "a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment."  O'Malley v. Dep't of Energy, 109 N.J. 309, 317, 537 A.2d 647 (N.J. 1987) (citing Horsemen's Benevolent & Protective Ass'n v. Atlantic City Racing Ass'n, 98

---

[7] Even if a promise of COD payment had been made it does not change the analysis since BL insisted as early as July 30 on CIA terms.

29

N.J. 445, 487 A.2d 707 (1985)); see also Miller v. Miller, 97
N.J. 154, 163, 478 A.2d 351 (1984) (party seeking equitable
estoppel "must show that the alleged conduct was done, or
representation was made, intentionally or under such
circumstances that it was both natural and probable that it would
induce action" and "the conduct must be relief on, and the
relaying party must act so as to change his or her position to
his or her detriment."). Thus, detrimental reliance is a
necessary element of a claim for equitable estoppel. See, e.g.,
Barone v. Leukemia Soc'y of Am., 42 F. Supp. 2d 452, 464 (D.N.J.
1998).

BL's unilateral decision in late July to insist on CIA terms
after to the goods were ready to be shipped is not justifiable
reliance on a falsehood or material omission. Rather, it is the
knowing and voluntary assumption of a business risk. While the
purchase order itself is a form of promise, that alone and
without more, does not suffice. If that were the case, every
company that received a purchase order would have a claim of
promissory estoppel in every failed contract case. The law of
promissory or equitable estoppel is not so broad.

In essence, BL's equitable estoppel claim fails for the same
reason it acted in breach of the contract. Its unilateral
actions amounted to an assumption of the risk that the parties

30

would not reach an agreement on payment terms and when those negotiation failed it insisted on commercially unreasonable payment terms inconsistent with the UCC.  A claim based on such facts is not compensable in equity.  Accordingly, Plaintiff's equitable claims are also dismissed.

### III. **CONCLUSION**

For the reasons set forth above, the Court finds no cause for liability on both Plaintiff's contractual and equitable claims.  Accordingly, the case will be dismissed with the costs to be borne by the respective parties.  An appropriate Order will be entered.

<u>   s/ Noel L. Hillman           </u>
NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

Dated: <u>December 31, 2014</u>